UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Lakisha Mason, o/b/o A.M., a minor, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | No. 18 CV 50329 |
| ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| *Defendant*. ) | |

# **MEMORANDUM OPINION AND ORDER[1]**

Plaintiff is seeking supplemental security income for her son, A.M., who was six years old and just finishing kindergarten when the application was filed and who was nine years old and about to start the fourth grade when the administrative hearing was held.[2] School records from this three-year period constitute the main body of evidence. The administrative law judge considered the six child domains and found that plaintiff had marked limitations only in the third domain ("interacting and relating with others"). This finding was based on A.M.'s history of behavioral problems, which as described by the ALJ, included "multiple referrals and suspensions for physically aggressive behavior and chronic disruption." R. 114. However, the ALJ found that A.M. had "less than marked" limitations in the other five domains. Because a claimant must have marked limitations in at least two of the six domains (or extreme limitations in one), the ALJ found A.M. not disabled. Plaintiff argues that the ALJ erred in not finding that

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

1

A.M. had a marked limitation in the second domain ("attending and completing tasks") based on the fact that A.M. remained behind peers and continuously received special education assistance.

**BACKGROUND**

In kindergarten, A.M. engaged in disruptive behavior at school and home. As recounted in plaintiff's opening brief, he stabbed his brother near the eye with a pencil, played with razor blades and fire, and physically assaulted his teachers. Dkt. #16 at 1. He was put on an Individualized Education Program ("IEP") designed by teachers and counselors along with A.M.'s mother, the plaintiff here. As part of this assessment, A.M. was given various objective tests, such as the Kaufman Tests of Educational Achievement and the Behavioral Observation of Students in Schools. R. 107-08. Over this period, the IEP team periodically re-assessed A.M.'s academic performance and behavior to determine what type of ongoing special education assistance was needed.

On September 27, 2017, the ALJ issued a decision finding A.M. not disabled. The ALJ first found that A.M. had the following severe impairments: "attention hyperactivity deficit disorder (ADHD), conduct disorder, mood disorder, [and] childhood disintegrative disorder." R. 105. After briefly summarizing the testimony of A.M.'s mother, the ALJ then set forth a chronological summary of A.M.'s school and medical records. Next, the ALJ analyzed the medical opinions, giving great weight to the State agency consultants who reached the same conclusion as the ALJ. The ALJ then considered the opinion of A.M.'s kindergarten teacher, Katheryn Lundine, who opined in a teacher questionnaire that A.M. had "very serious" difficulties in attending and completing tasks, among other areas. R. 111. The ALJ gave this opinion only partial weight because the ALJ believed that A.M. had "academically [] improved" since kindergarten. R. 111. In the last part of the opinion, the ALJ analyzed the six domains.

# DISCUSSION

The basic framework for analyzing the issue in this appeal is set forth in 20 C.F.R. § 416.926a (hereinafter "Section 926a"). The ALJ summarized and purportedly relied on this section, as does this Court in the discussion below.

To determine whether a child under the age of 18 is disabled within the meaning of the Social Security Act, the ALJ conducts a three-step sequential evaluation. R. 103. The first two steps are not at issue here. At the third step, a claimant can argue either that he meets, medically equals, or functionally equals a listing. Plaintiff is arguing that A.M. functionally equals a listing. In assessing this question, an ALJ considers the child's abilities in six broad areas of functioning, known as the child domains. These domains are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To functionally equal a listing, the impairment must cause a "marked" limitation in two domains of functioning or an "extreme" limitation in one. 20 C.F.R. § 416.926a(a). A marked limitation is one that "interferes seriously" with the claimant's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).

This appeal is concerned only with the second domain, which the ALJ analyzed in a separate, stand-alone section. R. 113-14. The ALJ first summarized Section 926a. The ALJ noted, for example, that the second domain "considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the mental pace at which he performs activities and the ease of changing activities." R. 113. The ALJ also set forth a list from Section 926a of examples of marked or extreme limitations—specifically, a child who "(i) is easily startled, distracted, or over-reactive to

everyday sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (e.g. games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; (v) requires extra supervision to remain engaged in an activity; or (vi) cannot plan, manage time, or organize self in order to complete assignments or chores."

R. 113. After this summary, the ALJ provided the following analysis:

> <u>The claimant has less than marked limitation in attending and completing tasks</u>. However, the claimant was placed on an IEP with a diagnosis of developmental delay. A conference summary in June 2014 showed he was very active and was making progress in reading but he continued to have trouble maintaining focus and staying on task. It was also noted he was able to function in the classroom and the building unless he was angry or frustrated. He also was able to take care of his personal needs independently. Socially, he struggled to follow directions when given the first time, but when given individual instructions he can start the task and finish on his own. A psychological evaluation in September 2014 indicated the claimant had normal motor activity, normal speech, upbeat mood, and bright affect. He was able to hear and understand conversational voice. He also was able to count, recite the alphabet without difficulty, perform simple calculations, and recall four digits forward. In 2016, it was noted that he was getting good grades, getting along with family, and helping with chores at home. A recent reported [sic] in 2017 indicated when the claimant is able to concentrate and focus on his work, he does well in class. The undersigned finds that the claimant has less than marked limitations in attending and completing tasks.

R. 113-14 (internal citations omitted). To summarize, this paragraph discusses four pieces of evidence: (i) a June 2014 IEP report; (ii) a September 2014 report by Dr. Peggau; (iii) statements A.M.'s mother made at an August 18, 2016 medical visit; and (iv) a 2017 report card.

Plaintiff argues that this analysis is vague, incomplete, and relies on cherrypicking. This Court agrees. The Government implicitly concedes that the paragraph, by itself, is inadequate, but the Government attempts to remedy this inadequacy by supplementing the paragraph with statements taken from other parts of the ALJ's decision. The Court finds that the Government's "new and improved" analysis is still inadequate, but before explaining why, it is worth noting

4

why this paragraph—the only place where the ALJ purported to analyze this issue—was deficient.

First, the paragraph contains no analysis. Instead, it is just a set of unconnected data points. No attempt has been made to explain why this evidence either proves, or disproves, the conclusion. There is no rationale connecting the individual pieces of evidence. Also, we do not know what rules or standards were applied. The ALJ did not try to connect the evidence back to the Section 926a standards. For example, the fifth example asks whether the claimant "requires extra supervision to remain engaged in an activity." This seems at least arguably relevant to A.M. In sum, because the ALJ provided no explanation, the Court cannot follow the path of his reasoning. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (a case must be remanded where the ALJ's decision "is so poorly articulated as to prevent meaningful review").[3]

Second, and further elaborating on the first point, the four pieces of evidence the ALJ chose to discuss are a mixed bag. Some of them ostensibly support plaintiff's theory in a general way, while others loosely support the ALJ's findings. But these conclusions cannot be stated with any confidence because the ALJ basically just deposited a pile of facts onto the page, leaving it to the reader to make sense of them. This just-list-the-facts approach might be acceptable if the facts were unequivocal and self-evidently demonstrated the implicit conclusions being offered. But in this case, the Court is unsure how to interpret some of them.

---

[3] The ALJ's lack of analysis cannot be remedied by citing to the two state agency physician opinions stating that plaintiff had less than marked limitations in this area, Dkt. #23 at 6; R. 78-79, 92-93. Both of those opinions merely summarized certain pieces of evidence without providing any explanation or analysis. *See Cory Z. v. Saul*, 18 CV 50219, 2019 WL 6327427, *4 (N.D. Ill. Nov. 26, 2019) ("the [state agency] physicians provided no explanation or analysis, making it impossible for this Court to follow their reasoning"). Moreover, Dr. Hudspeth's opinion was rendered on October 9, 2014 and Dr. Pittman's opinion was rendered on July 30, 2015, which were both before a substantial portion of the relevant evidence had been developed.

The parties also seem confused because they read the same paragraph differently. The confusion likely stems from the fact that the observations are in tension with each other. Consider the June 2014 report, the one discussed at the most length. Some of the observations (*e.g.* A.M. was "able to function in the classroom") suggest his difficulties were not that serious, while others (*e.g.* A.M. "continued to have trouble maintaining focus and staying on task") point in the opposite direction. There is a back and forth quality to this summary—reading it feels like watching a closely contested basketball game with numerous lead changes. Based on this Court's tally, the ALJ's summary of the June 2014 report contains five positive and three negative statements. So if one were taking a mechanistic numerical approach, one could argue that, on balance, the report slightly favors the ALJ's finding that plaintiff had "less than marked" limitations. In general, when a decisionmaker reaches a conclusion and then discusses evidence relevant to that conclusion, the presumption is that the evidence is being offered to *support* that conclusion. And this seems to be how the Government interprets this paragraph. It argues that the June 2014 report, along with the other pieces of evidence, *all* "demonstrate[e] that A.M.'s attentional difficulty was not as severe as plaintiff alleged." Dkt. #23 at 4-5.

But this is where things get confusing. In her opening brief, plaintiff offers a different interpretation. She takes the position that the ALJ was citing to the June 2014 report, not because it supported the ALJ's position, but because it undermined it. That is, the ALJ was citing to this report as an "acknowledgement" of counter-evidence and was using it as a "contrast" to later evidence showing A.M. was improving. Dkt. #16 at 5. In other words, plaintiff is trying to retrofit the evidence discussed in this paragraph onto the improvement rationale the ALJ mentioned earlier in the opinion when discussing Ms. Lundine's opinion. Fortunately for this appeal, we need not go further down this analytical rabbit hole because the mere fact that the

litigants cannot even agree on what the ALJ's rationale was in deciding this critical question is itself a sign that more work needs to be done.

Third, putting aside the above concerns, there is a separate question as to why the ALJ chose only these four pieces of evidence. As the ALJ's own earlier summary of the evidence indicates, there were many other reports and statements that could have been chosen. Plaintiff argues that there was a "wealth of information" showing A.M.'s inability to concentrate. *Id.* This evidence includes, to cite just one example, the Conners 3-T Content Scale showing that A.M. had a "very elevated" score in the area of inattention. *Id.* at 5. The ALJ did not explain why these four pieces of evidence were chosen. Were they particularly important or representative? The failure to provide an explanation raises the concern of cherrypicking.

Fourth, even if the analysis were fairly limited to this universe of four documents, there is a concern that ALJ did not fairly summarized their overall import. As an illustrative example, consider the second piece of evidence—the Peggau report. Ex. 6F. Dr. Peggau interviewed A.M. for 40 minutes in September 2014. The ALJ only mentioned these observations from the report:

> [T]he claimant had normal motor activity, normal speech, upbeat mood, and bright affect[.] He was able to hear and understand conversational voice. He also was able to count, recite the alphabet without difficulty, perform simple calculations, and recall four digits forward.

R. 114. As a preliminary point, although these findings do relate to the general subject of the second domain, one could question how relevant these minimal abilities are to the ability to sustain attention and complete tasks. Is the ability to recite the alphabet relevant to whether A.M. could independently "begin, carry though, and finish [his] activities" (§ 416.926a(h))? This is a question that can be explored further on remand with the assistance of an expert. But the broader concern is that the ALJ did not acknowledge that Dr. Peggau had doubts about A.M.'s overall functioning. In contrast to the ALJ's rosy summary, here are the report's conclusions:

7

> **SUMMARY AND CONCLUSION:**
>
> The claimant is a 6½-year-old first grader who came to the evaluation session with his mother. He has long-standing problem with aggressive behavioral issues that are dangerous. He set the kitchen on fire. He burned a boy's hair and burned two other kids with a hot nail clipper that he first heated up with matches. He stabbed two kids with pencils and was suspended in kindergarten. He just started first grade and had also a suspension that ended yesterday for "kicking, punching, biting and scratching". He does this with teaching staff, teachers, and peers.
>
> The claimant is reportedly in therapy but progress is apparently not very fruitful. He has been in therapy since earlier this year and his therapist alleged childhood disintegrative disorder. The therapist believes that this diagnosis is "definitive".
>
> During today's evaluation session, the claimant's behavior and history were reflective of a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated, as manifested by the presence of several of the possible criteria of: bullying, threatening, intimidating, initiating physical fights, using a weapon (including a pencil), being physically cruel to people, deliberately engaging in fire setting and deliberately destroying other people's property.
>
> His prognosis is guarded at best, particularly without intervention.

R. 591. The ALJ omitted these findings. It is true that they are geared more to plaintiff's behavioral problems rather than specifically his concentration problems, but there may be some overlap between the two categories. Dr. Peggau's bottom-line conclusion that A.M.'s prospects were "guarded at best" deserves some acknowledgment. Moreover, earlier in his report, Dr. Peggau stated that he had reviewed A.M.'s school records and that these records showed that A.M. "was having serious behavioral problems *and* struggling to be cooperative or *stay on tasks*." R. 589 (emphasis added). Nowhere in his report did Dr. Peggau express doubts about this conclusion. In sum, Dr. Peggau's entire report conveys a materially different picture from the "normal" findings described by the ALJ.

For all the above reasons, the Court finds that the ALJ's analysis was insufficient. The remaining question is whether this deficiency can be remedied, as the Government argues, by

8

looking to other parts of the ALJ's decision to fill in the missing pieces. Although the Government makes a spirited effort, the Court finds that the same basic infirmities are still present to an unacceptable degree.

The Government's reliance on the ALJ's earlier factual narrative as a source for the ALJ's thinking is hampered, again, by lack of any explicit analysis. One can try to derive inferences from the ways the ALJ juxtaposes facts, or from the ALJ's use of conjunctions and connectives like "but" and "however." But these inferences are still mostly educated guesses. To illustrate the difficulty, consider as an example the following passage:

> Treatment records from Rosecrance indicated the claimant was treated for disruptive mood dysregulation disorder, ADHD, and oppositional defiant disorder. It was noted that claimant was doing well. In May 2015 [sic] where the claimant exhibited unsafe behavior by wrapping a cord around his neck. He then had an inpatient psychiatric hospitalization at Streamwood and his medications were adjusted to Prozac, Tenex, and he was started on Ritalin.

R. 109 (citations omitted). It is fair to say that this passage lacks a cohesive storyline. It feels as if one minute A.M. was "doing well" but then the next minute was in a psychiatric hospital.

This leads us back to what might be the most promising rationale, one that could perhaps explain some of the anomalies in the ALJ's decision. This is the improvement rationale—specifically, A.M.'s academic problems were severe early on, sometime around kindergarten, but then got better at some undefined point over the ensuing three-year period. As noted above, the ALJ did not mention this rationale when analyzing the second domain, raising a question as to whether the ALJ was really relying on it. However, the ALJ did mention it when discussing Ms. Lundine's teacher questionnaire.

Although this rationale may have the potential to reconcile some of the discordant evidentiary strands, it now exists in only skeletal form and has not been supported by substantial evidence. Plaintiff disputes the core contention that A.M. improved academically. Plaintiff's

9

main evidence is the special education assistance. Plaintiff spends several pages in her opening brief going through the many details about the number of minutes for each subject for each year. The upshot of this analysis is that plaintiff believes A.M.'s special education minutes remained roughly the same, or may have even escalated, over the three-year period. Plaintiff also notes that, just before the hearing, A.M. was designated to be "placed in a self contained cross categorical classroom." Dkt. #16 at 11. It is not entirely clear what this phrase means practically, but plaintiff believes it cuts against the improvement rationale. Plaintiff argues that the ALJ ignored this whole line of evidence. In its response brief, the Government offers no rebuttal, neither contesting plaintiff's interpretation of the facts, nor taking issue with the proposition that special education minutes are a valid metric. The Court agrees with plaintiff that this line of evidence (special education assistance) should have been considered more carefully, along with other possible indicators, including grades and teacher evaluations and objective tests. As noted above, Section 926a specifically lists as one of the six examples of a marked limitation the situation where the child "requires extra supervision to remain engaged in an activity." In *Hopgood v. Astrue*, 578 F.3d 696 (7th Cir. 2009), an analogous case cited by plaintiff, the Seventh Circuit remanded because, among other things, the ALJ relied on the fact that the claimant's grades improved but then failed to "take into account that [the claimant's] IEP required him to turn in only 60% of his assignments." *Id.* at 700. A similar argument could be made here.

     In sum, the Court finds that a remand is required because the ALJ "made conclusory statements" and "failed to address portions of medical and school records that were favorable" to A.M. *Id.* at 697. Any remaining issues not addressed herein can be considered on remand along with the above issues. Plaintiff's counsel should raise all such issues with the ALJ on remand,

both in a pre-hearing brief and at the administrative hearing. Failure to explicitly raise these issues may result in a waiver if this case is again appealed to this Court.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is reversed and remanded for further proceedings.

Date:  March 25, 2020  By:  *Lisa A. J_____*
Lisa A. Jensen
United States Magistrate Judge